ORIGINAL

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED

AUG 1 0 2004

CLERK, U S DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

ROBB EVANS, as Receiver for TLC America, Inc ,

　　　　Plaintiff,

　　　　vs

JAMES F GARRO, an individual, DAVID PRICE, an individual, PAUL CHOVANEC, an individual, TERRY E PROVENCE, an individual, ALLISON-McCLOSKEY ESCROW CO , a California corporation, NAVAJO CAPITAL, INC , a Wyoming corporation, SIENNA FINANCIAL LTD , a British Virgin Islands corporation, CAMELOT INTERNATIONAL, LLC, a Wyoming limited liability company, MERLIN FINANCIAL, LLC, a Wyoming limited liability company, CORFU INTERNATIONAL, LLC, a Wyoming corporation, THE LANCELOT FOUNDATION, a Wyoming nonprofit company, APPALOOSA INTERNATIONAL, INC , a Wyoming corporation, CITATION FINANCIAL MANAGEMENT, INC , a Wisconsin corporation, CERTEX INVESTMENTS, INC , a Wisconsin corporation, DURHAM CAPITAL GROUP, INC, a Nevada corporation, and FORTRESS FINANCIAL LTD , a British Virgin Islands corporation,

　　　　Defendants

CASE NO. SACV 01-819 DOC (AnX)

[PROPOSED] AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TRIAL:　　Nov. 6, 2002
TIME:　　8:30 a.m.

JUDGE:　　David O. Carter
CTRM:　　9D

DOCKETED ON CM

AUG 1 1 2004

BY_____ 074

152

SACV01819

This action came on for trial before the Court on November 6, 2002, before the Honorable David O Carter, United States Judge, on the evidence of Robb Evans as Court Appointed Receiver for TLC America, Inc and related entities ("PLAINTIFF") for judgment against defendants DAVID PRICE ("PRICE") and DURHAM CAPITAL GROUP, INC ("DURHAM CAPITAL") The evidence presented having been fully considered and the issues having been duly heard, the Court hereby makes the following findings of fact and conclusions of law

## I.

## **FINDINGS OF FACT**

1    Beginning in August, 1999, the Defendant PRICE and his company, DURHAM CAPITAL solicited TLC to invest in a purported "leveraged investment trading program" which would allegedly generate a profit of 100% within 15 days  (*See* Exhibit 2 Tabs A and H, Bates Nos  03107-03108 and 03152-03153, respectively )

2    Frank Cossey, President and CEO of TLC, sent the necessary documents to participate in the investment program to PRICE on or about August 3, 1999  (Exhibit 2, Tab B 2, Bates Nos  0384-0389 & Tab B 2, Bates Nos 03110-03111 )

3    Frank Cossey signed a letter of Intent with Defendant SIENNA FINANCIAL LTD  (an entity controlled by Defendant JAMES GARRO ("GARRO") to participate in the trading program on September 7, 1999, which was modified to reflect a date of September 14, 1999  (Exhibit 2, Tab H, Bates Nos  03152-03153 )

4    Based on the Defendants' representations, TLC invested $20,000,000 of its investors' funds  (Exhibit 2, Tab C, Bates Nos  03121-03122 )  On September 13, 1999, TLC wired $20,000,000 to an escrow account set up by ALLISON-MCCLOSKEY ESCROW COMPANY (the "ALLISON-

SACV01819

MCCLOSKEY account"). (Exhibit 2, Tab D, Bates No 03127, Tab E, Bates No 03129, and Exhibit 3 1, Tab F, Bates No 02331 )

5      During September and October of 1999, Defendants' targets, including TLC, deposited a total of approximately $37,500,000 (including TLC'S $20,000,000 investment) in the ALLISON-MCCLOSKEY account  (Exhibit 3 1, Tab N, Bates No 02425 )

6      On September 20, 1999, Cossey, on behalf of TLC, authorized ALLISON-MCCLOSKEY to release its funds to J F GARRO ("GARRO") OF SIENNA FINANCIAL, LTD  ( Exhibit 2, Tab I, Bates Nos 03167-03168 )

7      Two days later, TLC instructed SIENNA to deposit its profits to TLC's Tokai Bank account  (Exhibit 3 2, Tab J, Bates No 02709 )

8      GARRO advised TLC on September 24, 1999, that the "issuing bank" had accepted the "buy order" for financial instruments which SIENNA would immediately resell  ( Exhibit 3 1, Tab K, Bates No 02276 ) Accordingly, TLC's $20,000,000 investment, plus the promised rate of return, should have been returned within 15 days of September 24, 1999, or no later than October 9, 1999

10      Instead of sending the funds to the "issuing bank" or to SIENNA, on October 7, 1999, GARRO instructed ALLISON-MCCLOSKEY, as escrow agent, to deduct its fee ($2,000 00) and wire the balance of the funds, $37,498,000, to his NAVAJO CAPITAL, INC checking account at Bank of America, Del Mar Heights Branch in San Diego, California (the "NAVAJO checking account")  ( Exhibit 3 1, Tab L, Bates Nos 02328-02329, Tab M, Bates No 02422, Tab N, Bates No 02425, and Exhibit 4, Tab O, Bates Nos 01053-01054 )

11      On that same day, GARRO opened a new interest maximizer account at the same bank in the name of NAVAJO CAPITAL (the "NAVAJO interest maximizer account") and transferred $37,497,000 to said account  (Exhibit 4, Tab P, Bates Nos 01060-01061 )

-2-

12    No other monies were deposited in the NAVAJO interest maximizer account before October 19, 1999  Prior to the deposit of funds from ALLISON-MCCLOSKEY, the balance of the GARRO'S NAVAJO CAPITAL checking account on September 1, 1999 was overdrawn by $4 65  ( Exhibit 4, Tab O, Bates No  01051 )

13    Although most of the other investors that initially transferred funds to the ALLISON-MCCLOSKEY account were repaid by Defendants, TLC, despite repeated demands, received only $10,000,000 from its $20,000,000 investment  The $10,000,000 was repaid to TLC from GARRO'S NAVAJO CAPITAL interest maximizer account--$4,500,000 is shown in Exhibit 4, Tab P (Bates No  01061) and $2,000,000 is shown in Exhibit 4, Tab Q (Bates No  01063),  and from two other accounts to which GARRO transferred funds, CITATION ($2,000,000 is shown in  Exhibit 5, Tab EE (2nd), Bates No  01044), and MERLIN ($1,500,000 is shown in Court's Exhibit 6 1, Tab II, Bates No 00083 )  These repayments are shown in a document prepared by Gary Williams, CFO of TLC (Exhibit 2, Bates No  03310, and on a Summary of TLC's Financial Transactions, shown at Exhibit 14)  A schedule of repayments to other investors in shown at Exhibit 17  Repayments to the investors represented by a Dr  Prasanna Kumar could not be verified since those funds were, according to a release executed between GARRO and Dr  Kumar, to be paid into an account in Jersey, Channel Islands  (Exhibit 20)  Repayments to a Veronica DiSabello could not be fully verified since she signed a release in which she agreed that a portion of the funds due her could be paid to a Wade West  (Exhibit 21)

14    At the time of the Receiver's appointment, an additional $10,000,000 plus profit and interest was still owed to TLC   TLC made repeated demands for the return of its money  (Exhibit 2, Bates Nos  03242, 03289, 03316  Garro made repeated promises to repay the funds, and assured TLC that "your funds have always been safe and never at risk "  (Exhibit 2, Bates Nos  03236, 03292 )  TLC

- 3 -

SACV01819

continued to request the return of its money right up to the time of the Receiver's appointment  Indeed, the transfer of the La Jolla property to TLC and subsequently to the Receiver was initiated after a search warrant was executed at TLC's offices  A schedule of amounts still due TLC, including interest accrued through September 30th, 2002, is shown at Exhibit 16

15    Instead of investing the TLC's funds with an "issuing bank," GARRO transferred $2,500,000 of TLC's funds from his NAVAJO interest maximizer account to an account at Bank One in the name of DURHAM CAPITAL GROUP INC  (the "DURHAM account") on October 19, 1999 (Exhibit 4, Tab Q, Bates No  01063, Exhibit 6 1, Tab S, Exhibit Bates No  02881, and  Tab T (2nd), Bates No  00590 )

16    PRICE and his wife CAROL MILLER PRICE (collectively the "PRICES") are the signatories to the DURHAM account  ( Exhibit 6 1, Tab T (1st), Bates Nos  00491-00492)  Defendants PRICE and DURHAM CAPITAL admitted such facts in their Answer to Plaintiff's original complaint

17    The PRICES immediately purchased a home with TLC's funds  The same day DURHAM CAPITAL received the funds from NAVAJO, PRICE transferred $1,000,000 out of the DURHAM account to a new account at Bank One in the name of CAROL MILLER PRICE (the "PRICE account")  (Court's Exhibit 6 1, Tab T (2nd), Bates No  00587, Exhibit 6 2, Tab U, Bates No  03413 and Tab V,  Bates No  03393 )

18    Two days later, on October 21, 1999, the PRICES signed a contract to purchase a home at 7843 Marquette Street, Dallas, Texas, from Gage Homes for $775,000 ( Exhibit 7, Tab Y-2, Bates Nos  03444-03452), and, on October 23, 1999, they closed on the property ( Exhibit 7, Tab Y-1, Bates Nos  03437-03438)

19    On October 23, 1999, CAROL MILLER PRICE wrote a check to Bank One in the amount of $769,960 08 for "7843 Marquette" (Exhibit 6 2, Tab W, Bates Nos  03390-03391) and obtained a cashier's check payable to

- 4 -

Chicago Title Company (Exhibit 18)  The warranty deed for the property was also dated October 23, 1999 and was recorded on October 26, 1999 (Exhibit 8, Tab X, Bates Nos 03416-03418)  A diagram showing the flow of funds for the purchase of the Price Residence at 7843 Marquette is shown at Exhibit 15

20    Until July 24, 2002, the property was owned free and clear by the PRICES  On that date, which was the same date Plaintiff recorded a lis pendens on the property, the PRICES took out a $400,000 home equity loan ( Exhibit 8, Tab X, Bates Nos 03420-03429), which mortgage was not recorded until August 2, 2002

21    The PRICES also spent TLC funds to furnish the house  Out of the $1,000,000 transferred on October 19, 1999, CAROL MILLER PRICE  paid a design firm an additional $155,000 in November and December 1999, and January 2000  (Exhibit 6 2, Tab Z-1, Z-2 and Z-3, Bates Nos  03402, 03407 and 03411 )

22    In addition to purchasing a home, the PRICES spent TLC funds on a lavish lifestyle which included trips to Asia and Europe  Prior to receipt of the funds from NAVAJO CAPITAL, the balance in the DURHAM account was only $9,707 52  ( Exhibit 6 1, Tab T (2nd), Bates No 00587 )  In the month following the transfer, the PRICES incurred debit card charges and withdrawals totaling $947,196 47, and checks written totaled $1,537,316 49 (including the $1,000,000 check to CAROL MILLER PRICE)  (*Id*, Bates Nos  00587-00592 )

23    On November 8, 1999, the ending balance in the DURHAM account was $180,597 81  (*Id*, Bates No  00587 )  In November and December 1999, the PRICES spent an additional $58,853 17 which included charges incurred at the Hotel Intercontinental in New York, the Hotel Relais Carto Firenze in Florence, Italy, the Peninsula Hotel in Kowloon and the Hotel De La Ville in Rome  The PRICES' charges on the DURHAM account also included airfare, purchases at Harrah's Las Vegas, dinners at the Prime Rib in Washington, D C , charges at Polo/Ralph Lauren and Saks Fifth Avenue in New York, charges at the Fendi

- 5 -

Shop and Max Mara Shop in Rome, and charges at the International Pearl Center in Kowloon (Exhibit 61, Tab AA, Bates Nos 00581-00585)

24    PRICE and/or DURHAM CAPITAL also sent money to Defendants TERRY PROVENCE ("PROVENCE") and his company, Defendant FORTRESS FINANCIAL ("FORTRESS") The same day PRICE received the funds, he sent two wire transfers, one in the amount of $337,500 and one in the amount of $112,488 to PROVENCE and/or FORTRESS In their Answer to Plaintiff's original complaint, PRICE and DURHAM CAPITAL admitted making such payments to PROVENCE and/or PROVENCE

25    In addition to the $2,500,000 payment discussed above, NAVAJO CAPITAL sent an additional $17,490,000 to Defendant DURHAM CAPITAL through a bank account at US Bank in Wisconsin in the name of Defendant CITATION FINANCIAL MANAGEMENT ("CITATION") First, on October 22, 1999, NAVAJO sent $30,000,000 of the $37,500,000 back to ALLISON-MCCLOSKEY (Exhibit 31, Tab R, Bates No 02330) Then, ALLISON-MCCLOSKEY reopened the escrow account, and, on November 4, 1999, GARRO and Defendant PAUL E CHOVANEC ("CHOVANEC") instructed ALLISON-MCCLOSKEY to transfer $25,000,000 to CITATION's account at US Bank and the remainder ($5,027,951 71) back to the NAVAJO CAPITAL account ( Exhibit 31 Tabs BB & CC, Bates Nos 02269-02270 and 02280, respectively)

26    CITATION immediately moved the funds to a new money market account (Exhibit 5, Tabs DD and EE (1st), Bates Nos 01016 and 01039-01040, respectively )

27    Some of the money was used to repay investors, including TLC, which received $2,000,000 from CITATION (Exhibit 5, Tab EE (2nd), Bates No 01044)

-6-

SACV01819

28    The rest, $17,490,000 ($17,500,000 less $10,000), was transferred to DURHAM CAPITAL's Bank One account on November 30, 1999 (Exhibit 5, Tab EE (2ⁿᵈ), Bates No 010046 and Exhibit 6 1, Tab FF, Bates No 00512)

29    DURHAM CAPITAL transferred the $17,490,000 received from CITATION to a sub-account in the name of MERLIN FINANCIAL on December 6, 1999 (Exhibit 6 1, Tabs GG and HH, Bates Nos 00509 and 00618, respectively) A diagram showing the flow of $37 5 million of investor funds through the defendants' bank accounts at Union Bank, Bank of America, US Bank, and Bank One, is shown at Exhibit 14

30    GARRO is the signatory to the MERLIN FINANCIAL sub-account (Exhibit 6 1, Tab T, Bates Nos 00493-00494 )

31    MERLIN FINANCIAL repaid investors with some of these funds, including TLC and spent the rest on the purchase of luxury homes, travel, transfers of approximately $2 million to brokerage firms Merrill Lynch and A G Edwards (Exhibit 4, Bates Nos 01082, 01083, 01096, and Exhibit 9) and other items

32    PRICE incorporated DURHAM CAPITAL in Nevada in February 1999  (Exhibit 12, Bates Nos 03466, 03467) PRICE is the sole Director of DURHAM CAPITAL and is its President, Secretary and Treasurer *Id* , Bates No 03469 )

33    Despite TLC's demand for return of said funds, PRICE and DURHAM CAPITAL have refused to return the remaining funds due TLC   A schedule of amounts still due TLC is shown at Exhibit 16   The Plaintiff demands the return of the $3,923,222 59 as shown on Exhibit 16, less any cash payments still due from defendant Garro which are paid by defendant Garro or by those holding assets on his behalf   The cash payment due from defendant Garro pursuant to the terms of his Settlement Agreement is $418,221 00  Thus, the

-7-

amount of the Judgment sought by the Plaintiff from Defendants Price and Durham Capital is $~~3,505,001.59~~  $3,505,001.59

## II.

## CONCLUSIONS OF LAW

1    The Court has subject matter jurisdiction over this matter for the following reasons  (a) Plaintiff's appointment as an equity receiver over TLC and its related entities is sufficient to invoke the provisions of 28 U S C  section 1331 (federal question), and/or (b) 28 U S C  section 754 (ancillary jurisdiction for matters with receiver's powers)

2    The Court has personal jurisdiction over Defendants PRICE and DURHAM CAPITAL because each has sufficient minimum contacts with the United States and the State of California such that requiring them to defend this action in California does not offend traditional notions of fair play and substantial justice  *See International Shoe Co  v  Washington* (1945) 326 U S  310, 316 Defendants Durham Capital and David Price solicited TLC's investment by sending correspondence to TLC's office in Brea, California  They received funds from TLC's investment by wire transfer from Garro's Navajo Capital account at Bank of America in San Diego, California  Even if a non-resident defendant's activities are not substantial or continuous and systematic, the Court can exercise jurisdiction over a non-resident defendant where "(1) the non-resident defendant do[es] some act or consummate[s] some transaction with the forum or perform[s] some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws  (2) The claim must be one which arises out of or results from the defendant's forum-related activities  (3) Exercise of jurisdiction must be reasonable " *Data Disc, Inc  v  Systems Technology Associates, Inc*, 557 F 2d 1280, 1287 (9th Cir  1977)  Exercise of jurisdiction over Defendants Price and Durham Capital is proper because these defendants did some act (soliciting the

- 8 -

investment and receiving funds there from) within the forum state, the Plaintiff's complaint (misappropriation of funds received from the investment) is directly related to the defendants' forum-related activities, and the exercise of jurisdiction is reasonable  That Defendant PRICE'S contacts with California may have been as an officer of DURHAM CAPITAL does not insulate him from suit in California  *Davis v Metro Productions, Inc*, 88 F 2d 515, 521 (9th Cir 1989)  Furthermore, the actions of Defendant Garro in California may be imputed to Defendants PRICE and DURHAM CAPITAL because they conspired with Garro as described in the next finding of fact  *Certified Bldg  Products, Inc  v  NRLB*, 528 F 2d 968, 969 (9th Cir 1976)

3     PRICE and/or DURHAM CAPITAL conspired with Defendant GARRO to convert TLC's funds  Accordingly, GARRO's acts in furtherance of the conspiracy may be imputed to PRICE and/or DURHAM and subjects those defendants to joint and several liability

4     PRICE and DURHAM CAPITAL converted $2,500,000 in funds belonging to TLC, and this specific sum was sufficiently identified by Plaintiff  *See Fisher v  Mahado* (1996) 50 Cal App 4th 1069, 1072-1074  More specifically, TLC had an absolute right to possession of the $2,500,000 on October 19, 1999 when it was transferred to DURHAM and/or PRICE  As described in Finding of Fact Nos  25 through 28, PRICE and DURHAM also assisted GARRO in converting additional TLC funds by receiving $17,490,000 that GARRO's company, NAVAJO CAPITAL, routed through CITATION's bank account  PRICE and DURHAM transferred the $17,490,000 back to GARRO via his MERLIN FINANCIAL sub-accoutn on December 6, 1999, at which time TLC was still owed the specific sum of $11,500,000, including the $2,500,000 transferred to DURHAM and PRICE on October 19, 1999  (See Gary William's schedule at Exhibit 2, Bates No  03310 )  Such transfers were the result of intentional acts by Defendants that actually and substantially interfered with

- 9 -

TLC's right to possession of the funds *See Jordan v Talbot*, 55 Cal 2d 597 (1961), *Moore v The Regents of the University of California*, 51 Cal 3d 120, 136 (1990), cert denied, 499 U S 936 (1991) In addition, PRICE and DURHAM CAPITAL's transfers of such funds for their own personal use were without authority, thereby actually and substantially interfered with Plaintiff's property *Reynolds v Lehman* (1956) 138 Cal App 2d 586, 592, *Stutt v Ontario Sav & Loan Ass'n* (1972) 28 Cal App 3d 866, 874

5       Conversion is a strict liability tort that imposes liability on all those into whose hands the property comes *Moore, supra*, 51 Cal 3d at 144 The motive of the interference is immaterial *Chatterton v Boone,* 81 Cal App 2d 943, 946 (1947) That Defendants allegedly acted in good faith, without notice, and without negligence as to claim to the property, is no defense *Byer v Canadian Bank of Commerce,* 8 Cal 2d 297, 299 (1937), *see also Beverly Finance Co v American Casualty Co ,* 273 Cal App 3d 741, 749 (1969) Accordingly, Defendants' purported lack of knowledge that the $2,500,000 belonged to TLC is not a viable defense to Plaintiff's conversion claim

6       Despite TLC's demand for return of said funds, PRICE and DURHAM CAPITAL have refused to return the funds due TLC, thereby committing additional acts of conversion

7       PRICE and DURHAM CAPITAL hold TLC's funds in a constructive trust for the benefit of TLC Because GARRO did not hold title to these funds, he lacked the ability to legitimately transfer title to PRICE and DURHAM CAPITAL Cal Civ Code, sections 2223 & 2224, *FTC v Crittenden*, 827 F Supp 699 (C D Cal 1993) Therefore, PRICE and DURHAM CAPITAL are nothing more than gratuitous donees of TLC monies and, hence, hold those monies in constructive trust *SEC v Cross Financial Services*, 908 F Supp 718, 731 (C D Cal 1995), *SEC v The Better LifeClub of America, Inc ,* 995 F Supp

167, 180 (D D C 1998) ("gratuitous donee of fraudulently obtained funds is not a bona fide purchaser and may be subject to a constructive trust")

8    In choosing between PRICE and DURHAM CAPITAL and the victims of GARRO's fraud (i e , TLC), "equity dictates that the rights of the victims should control " *Cross Financial Services*, 908 F Supp at 731

9    That TLC's funds were commingled with other monies at the time the October 19, 1999 transfer of $2,500,000 and the November 30, 1999 transfer of $17,490,000 were made to PRICE and DURHAM CAPITAL does not impede TLC's right to recover such sum *Better Life Club*, 995 F Supp at 181 (when "legitimate assets are co-mingled with illegitimate ones such that the assets cannot be separated, a constructive trust may extend over the entire asset pool")

10    In order to prevent the unjust enrichment of DURHAM CAPITAL and/or PRICE, a constructive trust shall be imposed over the real property, fixtures and furnishings located at 7843 Marquette Street, Dallas Texas, subject to the rights of creditors having an interest superior to that of Plaintiff  Defendants DURHAM and PRICE, and their agents, servants, assigns and those acting in concert with them, are enjoined from engaging in any activities to transfer, secret or dissipate these assets  Such prohibited activities include selling, divesting, transferring, further encumbering, or otherwise dissipating the assets on which the constructive trust is imposed

11    PRICE is the alter ego of DURHAM CAPITAL  There is such a unity of interest and ownership between PRICE and DURHAM that, in reality, no separate entities exist and the failure to disregard the purportedly separate entities would result in fraud or injustice to TLC  *See American Tel & Tel Co v Compangnie Bruxelles*, 59 F 3d 586, 591 (9th Cir 1991) (decided under California law), *Pearl v Shore,* 17 Cal App 3d 608, 618 (1971), *Associated Vendors, Inc v Oakland Meat Co ,* 210 Cal App 2d 825, 837 (1962)  Accordingly, PRICE is

- 11 -

personally liable for the to Plaintiff for his damages of $3,505,001 59, plus the reasonable costs of suit

12    As an alternative ground for liability, Plaintiff has proven his claim for money had and received  California Jury Instructions, section 50 06 Money Had and Received, *Philpott v Superior Court,* 1 Cal 2d 512, 518-23 (1934)

13    As a result of the conduct of PRICE and DURHAM CAPITAL, Plaintiff has sustained damages in the amount of $3,505,001 59, plus the reasonable costs of suit

14    For the foregoing reasons, Plaintiff is entitled to judgment, jointly and severally, against DURHAM CAPITAL and PRICE for $3,505,001 59, plus the reasonable costs of suit  Additionally, a constructive trust shall be imposed over the real property, fixtures and furnishings located at 7843 Marquette Street, Dallas Texas, subject to the rights of creditors having an interest superior to that of Plaintiff  Defendants DURHAM and PRICE, and their agents, servants, assigns and those acting in concert with them, are enjoined from engaging in any activities to transfer, secret or dissipate these assets  Such prohibited activities include selling, divesting, transferring, further encumbering, or otherwise dissipating the assets on which the constructive trust is imposed

DATED  *August 10, 2004*                      _____
                                                                    HON  DAVID O  CARTER
                                                                    United States District Court Judge

SD 22106305 1

- 12 -

SACV01819